## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SANDRA CARDONA,

        Plaintiff,                      CASE NO.:

      v.                             JURY TRIAL DEMANDED

NUTRITION FORMULATORS, INC.,
and EMPLOYMENT SOLUTIONS of
NEW YORK, INC.,

        Defendants.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, SANDRA CARDONA ("Plaintiff" and/or "Ms. Cardona"), by and through her undersigned counsel, hereby complains of Defendants, NUTRITION FORMULATORS, INC., ("Defendant NF" and/or "NF") and EMPLOYMENT SOLUTIONS OF NEW YORK, INC. ("Defendant ESNY" and/or "ESNY") (collectively "Defendants"), and alleges as follows:

### INTRODUCTION

1.     This case involves a female employee who was unlawfully discriminated against and retaliated against by her employer on the basis of her sex and national origin.

2.     Ms. Cardona brings this action against Defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Florida Civil Rights Act of 1992, § 760.01, Florida Statutes ("FCRA").

### PARTIES

3.     Plaintiff is a Colombian-American female residing in the State of Florida.

4.     Defendant NF is a Florida for-profit Corporation, with its principal place of business located at 3260 Executive Way, Miramar, FL 33025.

5.     Defendant ESNY is a New York for-profit Corporation, with its principal place of business located at 111 North Main Street, Elmira, NY 14901.

6.     Defendant ESNY maintains a location at 6625 Miami Lakes Drive, Miami Lakes, FL, 33014 ("ESNY Miami Location").

7.     Upon information and belief, Defendant NF and Defendant ESNY (collectively "Defendants") were the Plaintiff's joint and/or sole employer.

8.     At all times material, Plaintiff worked at Defendant NF's property located at 3260 Executive Way, Miramar, FL 33025.

9.     The exact number of Defendants' employees is unknown, but upon information and belief, there are well more than the statutory minimum under Title VII and the FCRA.

10.    At all times material, Defendants were an "employer" within the meaning of 42 U.S.C. § 2000e(b).

11.    At all times material, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

12.    At all times material, Plaintiff was a "person" within the meaning of § 760.02(6), Florida Statutes, and Defendants were an "employer" within the meaning of § 760.02(7), Florida Statutes.

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367. This action is authorized and instituted pursuant to 42 U.S.C. § 2000e-5(f).

14.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Southern District of Florida. The Defendants were and are still located in this

judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

15.     Plaintiff has complied with all administrative requirements to file this action.

16.     On or around December 18, 2023, Plaintiff timely dual-filed a charge of discrimination against Defendant ESNY (Charge No. 510-2024-02478) and Defendant NF (Charge No. 510-2024-02479) with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

17.     On or around July 25, 2024, the EEOC issued Plaintiff's Notice of Right to Sue against Defendants.

18.     Plaintiff is timely commencing this action within ninety (90) days of receipt of the EEOC's Notice of Right to Sue.

## FACTUAL ALLEGATIONS

19.     Ms. Cardona is a Colombian-American woman and is therefore a protected class member.

20.     On or around June 16, 2023, Defendants hired Ms. Cardona as a Quality Assurance Inspector ("QAI").

21.     After several days, on or around June 19, 2023, Defendants asked Ms. Cardona to report to work for her first training shift.

22.     From the onset of Ms. Cardona's employment, Defendant NF promised her that when she completed 480 hours of work, Defendant NF would solely employ her, and this transfer would be accompanied by an increased wage and benefits.

3

23.     During Ms. Cardona's employment, Defendants, by and through its management and employees, subjected Ms. Cardona to harassing and discriminatory conduct, including but not limited to the following: 1) subjecting Ms. Cardona to derogatory remarks about her Colombian heritage, 2) subjecting Ms. Cardona to sexually explicit remarks about her Colombian accent, 3) sexually harassing and humiliating Ms. Cardona both privately and in front of her colleagues, 4) repeatedly asking Ms. Cardona to go on dates or engage in sexual activity despite her constant refusal,  5) threatening to kiss Ms. Cardona if she did not wear a facemask at work, 6) excluding and isolating Ms. Cardona from female colleagues in the workplace, 7) mocking Ms. Cardona after witnessing her harasser make disturbing and unwanted sexual advances towards her, 8) forcing Ms. Cardona to continue working with her harasser after reporting him, 9) warning Ms. Cardona not to be alone with her harasser in an area without cameras, and 10) unlawfully terminating Ms. Cardona's employment, among others.

24.     Ms. Cardona began experiencing pervasive discriminatory conduct from the onset of her employment in or around June 2023.

25.     Ms. Cardona was employed in an area of predominantly male coworkers where she received excessive, unnecessary attention from her male colleagues.

26.     Although Ms. Cardona was a confident and strong woman, she knew her male coworkers paid her more attention than usual. This was not because Ms. Cardona failed to perform her job duties or needed additional assistance – in fact Ms. Cardona was never informed of a failure to perform, at minimum, a satisfactory job.

27.     Ms. Cardona understood that she was receiving unwanted attention because she was a woman working in an environment surrounded by men. However, this would not deter her from fulfilling her QAI role for Defendants.

28.     Defendants employed Mr. Osniel Gonzales (hereinafter "Osniel") as a machine operator. Defendants required each machine operator to work alongside a QAI at least 3-4 times every single workday. As a result, Defendants assigned Ms. Cardona to work alongside Osniel at least 3-4 times every single day.

29.     Osniel is an individual Cuban male around 35 years old.

30.     Beginning the very first week of Ms. Cardona's employment, on or around June 19, 2023, Osniel made his intentions clear that he wanted to have an intimate and sexual relationship with Ms. Cardona, whether she felt the same or not.

31.     Osniel began hinting at his interest in Ms. Cardona in or around the first week of her employment, when he started incorporating comments into their conversation about how beautiful Colombian women were, how they speak in a *sexy* manner, and how Osniel personally loved the Colombian accent and went crazy for Colombian women.

32.     Immediately, Ms. Cardona noticed that Osniel did not speak to his other non-female colleagues in a similar manner. Ms. Cardona respectfully asked Osniel to stop making comments of that nature because she felt uncomfortable, and explained that she was merely there to work and could not change her accent.

33.     The following week, on or around June 26, 2023, Ms. Cardona's coworker, a fellow QAI named Yordania (last name unknown), informed Ms. Cardona that Osniel was asking highly personal questions about Ms. Cardona, seemingly hyper-curious about her life. Yordania told Ms. Cardona that Osniel was asking about Ms. Cardona's family, whether she was married, whether she was *happily* married, whether she was interested in Cuban men, and whether she had ever had sex with a Cuban man.

34.     Yordania and Ms. Cardona found this very strange, and to Ms. Cardona's relief, Yordania did not further engage in this discussion with Osniel and refused to answer his questions.

35.     Yet, Osniel was not satisfied with Yordania's response and demanded Ms. Cardona answer these pervasive and invasive questions.

36.     Osniel continued to hound Ms. Cardona with questions, each round becoming more and more sexually charged, but Ms. Cardona stood her ground, rejecting Osniel's grotesque and inappropriate remarks.

37.     Osniel's passes at Ms. Cardona only continued to ramp up, and by the third week of Ms. Cardona's employment, in or around July 3, 2023, Osniel begged Ms. Cardona to go on a date with him. In a desperate attempt for Ms. Cardona to say yes to the date, Osniel confessed his love for Ms. Cardona, declaring he could not fall asleep at night because he was always thinking about her and was obsessed with her Colombian accent.

38.     Ms. Cardona vehemently refused each and every advance made by Osniel, telling him that she was a married woman and he needed to stop making inappropriate passes at her, especially while at work. Ms. Cardona explained that she felt uncomfortable when he made comments to her and that he needed to stop.

39.     The following day, Osniel asked Ms. Cardona if she had a female relative that would go on a date with him. Ms. Cardona saw this as her chance to divert Osniel's attention from her to somebody else, so she provided Osniel with Ximena's, Ms. Cardona's cousin's, phone number.

40.     Unfortunately, several days later Ximena called Ms. Cardona and explained that Osniel clearly only had feelings for Ms. Cardona. In fact, Ximena told Ms. Cardona that Osniel said he would not rest until he had sex with Ms. Cardona.

41.     Ms. Cardona was terrified as she realized that Osniel was completely serious about pursuing her until she had sex with him, and that she had to face him at work each and every day. As a result, Plaintiff avoided Osniel when she was not assigned to his workstation.

42.     Osniel saw that Ms. Cardona was more closed off than usual and took exception to Ms. Cardona's attempts to protect herself. As a result, he started becoming aggressive with Ms. Cardona and began taking advantage of his assigned work-time with her by ignoring all work-related materials and continuing his sexual advances. Osniel eventually became so upset that Ms. Cardona was avoiding him that he screamed, "what you need is a Cuban man like me who will fuck you three times before sleep and go down on you to make you happy and to get rid of your bad mood."

43.     Ms. Cardona was appalled and disgusted by Osniel's outburst, and again responded with caution, asking him to calm down and focus on work.

44.     Osniel had one goal in mind while working with Ms. Cardona, to have sex with her, and he did not care who knew about it.

45.     Starting in or around July 2023, for the duration of Ms. Cardona's employment, Osniel would publicly make crude, humiliating, sexually harassing comments to Ms. Cardona during the staff's dinner break, where several managers were present. Each and every night in front of multiple staff members, Osniel would tell Ms. Cardona that he would not rest until she slept with him. Osniel even went as far as to say, "I'm going to give you the best oral sex you've ever had," and repeatedly said, "Cuban men are better than Colombian men… Colombian men are FAGGOTS and they don't enjoy going down on women."

46.     Ms. Cardona was hoping her coworkers or managers would speak up, but instead, the group of men laughed at Osniel's vicious verbal abuse.

47.     Many employees laughed, notable exceptions being Bertico (last name unknown) ("Bertico") and Lazaro (last name unknown) ("Lazaro"), who told Osniel to leave her alone and to show some respect. Osniel's response to their brave defense of their coworker was simple, he believed he could talk to Ms. Cardona however he wanted and explained that sooner or later she would fall in love with him. Osniel proudly exclaimed that "I will eventually see her cooking for me naked."

48.     From this point onwards, each night Defendants forced Ms. Cardona to report to Osniel was a different form of torture for her. On one occasion, Osniel asked, "Is your swimsuit a bikini, a Brazilian, or a one piece?"

49.     Further, each and every night, Osniel would ask Ms. Cardona if she wanted him to perform oral sex on her to make her happy. Ms. Cardona was disgusted and told Osniel to stop, but he ignored her.

50.     Ms. Cardona often went to Bertico's office, or another office where Rydel Martinez ("Rydel") and Susel Diaz ("Susel") worked, to cry until she could muster the courage to continue working.

51.     When Ms. Cardona could finally make her way back to Osniel's office, he continued to make remarks to her about looking sexy in a lab coat and wanting to have sex with her or perform oral sex on her.

52.     Osniel would also make threats of sexual assault and battery in passing when he saw Ms. Cardona in the hallway, "put on a facemask before I kiss you," or "I'm going to kiss you."

53.     Ms. Cardona was terrified for her well-being and threatened to call the police on Osniel if he kissed her. Arturo Mayor ("Mayor") and Adrian Sotolongo ("Sotolongo"),

Defendants' employees, saw an interaction where Ms. Cardona threatened to call the police but simply laughed and walked away.

54.     Ms. Cardona complained about Osniel's actions to her managers, many of whom had witnessed the harassment first-hand, yet nothing was done to correct this unlawful behavior.

55.     Ms. Cardona became anxious when she came into work to see Osniel had not been terminated, because Enrique (last name unknown) ("Enrique") and Osviel Hernandez Rodriguez ("Osviel"), Defendants' warehouse supervisors, knew about Osniel's discriminatory and sexually harassing conduct but failed to take corrective action and failed to protect Ms. Cardona from harassment or discrimination in the workplace. In fact, Osniel made harassing and discriminatory comments in front of Enrique and Osviel but they failed to reprimand him.

56.     Despite Ms. Cardona's repeated reports of Osniel's discrimination and sexual harassment, Enrique and Osviel took no meaningful corrective action against him.  Each time Enrique and Osviel were made aware of Osniel's relentless pursuit of Ms. Cardona, Osniel was never reprimanded, disciplined, or warned in any meaningful way as his conduct persisted.

57.     Ultimately, Defendants, by and through Enrique and Osviel's actions, encouraged discrimination and harassment to endure in Defendants' workplace.

58.     Instead of taking action against Osniel, Defendants' employees Enrique, Lazaro, and Rydel had each warned Ms. Cardona not to go to the back of the warehouse when she was alone on her break because Osniel knew there were no cameras there and "he might do something to you."  Ms. Cardona understood this warning to mean that her colleagues believed Osniel would sexually assault her at work, yet they failed to take any meaningful action that would rectify the situation.

59.     Osniel physically outmatched Ms. Cardona, and she feared what he would do to her if they were alone with no cameras watching.

60.     Ms. Cardona was afraid to walk to her car in Defendants' parking lot after her shift ended because of the fear Osniel had instilled in her.

61.     On or around July 19, 2023, Mr. Octavian Ion ("Mr. Ion"), Ms. Cardona's immediate supervisor, approached Ms. Cardona with a job opportunity and possible means of escaping Osniel's conduct. Mr. Ion promised Ms. Cardona that she could begin working as a Quality Assurance Documentation Specialist ("QADS") in several weeks, where Ms. Cardona would be working in the office, NOT in the warehouse, with a more favorable shift and a more manageable workload. This news came as a relief to Ms. Cardona as she had been looking for a chance to escape Osniel's, as Defendants were taking no effective measures to protect her from him.

62.     After months of Osniel's continued harassment, on or around September 11, 2023, Ms. Cardona had enough. While at dinner, Osniel told Ms. Cardona and their coworkers, "I already told [Ms. Cardona] I will see her cooking for me naked, happily after I go down on her and fuck her twice to energize her."

63.     Later that night, Osniel walked up to Ms. Cardona, went face to face with her, and threatened that he was going to kiss her because her facemask was off. Osniel's face started to inch closer and closer to hers, and his lips puckered, so Ms. Cardona SCREAMED and shoved him away before running out of his office in tears. While Ms. Cardona was fleeing, Osniel shouted, "Leave that faggot husband of yours – Colombian men are faggots."

64.     Ms. Cardona entered Enrique and Osviel's office, sobbing and shaken up, and again complained about Osniel's  unwanted sexual advances and discriminatory comments. Enrique and

Osviel reassured her that Osniel had gone too far this time, and that she would not lose her job for reporting his conduct. In fact, they said that they would report Osniel's conduct to Defendants' human resources department the following day.

65.     On or around September 12, 2023, Ms. Cardona showed up for work as usual. Ms. Cardona put on her uniform and carried out her normal routine, except she was instructed to call Enrique and Osviel to accompany her into Osniel's office for all Quality Assurance inspections. Finally, Enrique and Osviel took her complaint seriously, after seeing her crying and shaking, clearly devastated by Oniel's actions.

66.     However, Ms. Cardona's coworkers began telling her that they knew she reported Osniel and heard she would be terminated soon to avoid legal issues.

67.     The following day, on or around September 13, 2023, Ms. Cardona spoke to Mr. Ion over the phone to discuss the aforementioned QADS position he promised Ms. Cardona. Mr. Ion replied that the position would become available for her in two weeks, but otherwise did not address her complaints to Defendants' supervisors regarding Osniel's unlawful and harassing conduct.

68.     On or around September 14, 2023, just days after Ms. Cardona reported Osniel's discriminatory and sexually harassing conduct and comments, Defendants terminated Ms. Cardona.

69.     Not only did Defendants terminate Ms. Cardona while failing to discipline or reprimand Osniel, but they conveniently terminated Ms. Cardona after 451.80 hours of work, a mere 28.20 hours shy of being transitioned into the Quality Assurance Documentation Specialist position with a higher wage and benefits.

70.     The events described above are just some of the examples of unlawful discrimination and retaliation that Defendants subjected Ms. Cardona to on a continuous and on-going basis throughout her employment.

71.     Defendants unlawfully discriminated against Ms. Cardona because of her sex and national origin.

72.     Defendants retaliated against Ms. Cardona for complaining about and reporting sexual harassment and discrimination.

73.     Ms. Cardona claims a continuous practice of discrimination and claims continuing violations and makes all claims herein under the continuing violations doctrine.

74.     At all times material, Defendants' employees were acting as agents of Defendants in their unlawful treatment of Ms. Cardona.

75.     At all times material, Defendants acted with deliberate indifference to the unlawful treatment complained of herein.

76.     As a result of Defendants' actions, Ms. Cardona felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

77.     As a result of the acts and conduct complained herein, Ms. Cardona has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Cardona has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Cardona has further experienced severe emotional and physical distress.

78.     Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against Defendants.

79.     Defendants are either directly or vicariously liable for the unlawful conduct complained of herein.

## CAUSES OF ACTION
### COUNT I
**42 U.S.C. § 2000e-2**
*Sex Discrimination*
**(Plaintiff as Against All Defendants)**

80.     Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

81.     Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

82.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

83.     Ms. Cardona was an individual female and was therefore a protected class member.

84.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

85.     Defendants subjected Ms. Cardona to discriminatory treatment on the basis of her sex, including but not limited to, making sexually harassing remarks about Ms. Cardona's accent being "sexy", asking Ms. Cardona to go on dates or perform sex acts, telling Ms. Cardona that she "needed a man to fuck her and perform oral sex on her," telling Ms. Cardona that she "looked sexy in a lab coat," threatening to kiss Ms. Cardona in the workplace if she did not wear a facemask, forcing Ms. Cardona to work with her harasser despite being aware of his unlawful behavior and

13

knowing he posed a threat to Ms. Cardona's safety, warning Ms. Cardona not to be alone with her harasser in an area without cameras, and unlawfully terminating Ms. Cardona's employment.

86.     Defendants targeted Ms. Cardona because she was a woman. No similarly situated male employees endured the discriminatory conduct that Ms. Cardona was forced to endure.

87.     The discriminatory actions of the Defendants against Ms. Cardona, as described and set forth above, constitute an adverse employment action for the purposes of Title VII.  In subjecting Ms. Cardona to adverse employment actions, the Defendants intentionally discriminated against Ms. Cardona with respect to the compensation, terms, conditions, or privileges of her employment.

88.     Even if Defendants could assert legitimate reasons for its adverse actions taken against Ms. Cardona, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Cardona explicitly reserves the right to pursue a mixed-motive theory against Defendants.

89.     As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

90.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Cardona's rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

91.     The conduct of the Defendants deprived Ms. Cardona of her statutory rights guaranteed under Title VII.

92.     Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT II**
**42 U.S.C. § 2000e-2**
*National Origin Discrimination*
**(Plaintiff as Against All Defendants)**

93.     Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

94.     Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

95.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

96.     Ms. Cardona was Colombian-American and was therefore a protected class member.

97.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

98.     Defendants subjected Ms. Cardona to discriminatory treatment on the basis of her national origin, including but not limited to, telling Ms. Cardona that her Colombian accent was "sexy" and that "Colombian women are beautiful,"  making frequent derogatory remarks about Colombian men including "all Colombian men are faggots and they don't enjoy going down on

women," telling Ms. Cardona that "Cuban men are better than Colombian men…," making Ms. Cardona work with her harasser, and unlawfully terminating Ms. Cardona's employment.

99.     Defendants targeted Ms. Cardona because she was Colombian-American. No similarly non-Colombian employee endured the discriminatory conduct that Ms. Cardona was forced to endure.

100.    The discriminatory actions of the Defendants against Ms. Cardona, as described and set forth above, constitute an adverse employment action for the purposes of Title VII.  In subjecting Ms. Cardona to adverse employment actions, the Defendants intentionally discriminated against Ms. Cardona with respect to the compensation, terms, conditions, or privileges of her employment.

101.    Even if Defendants could assert legitimate reasons for its adverse actions taken against Ms. Cardona, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Cardona explicitly reserves the right to pursue a mixed-motive theory against Defendants.

102.    As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

103.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Cardona's rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

104.     The conduct of the Defendants deprived Ms. Cardona of her statutory rights guaranteed under Title VII.

105.     Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**42 U.S.C. § 2000e-3**
*Hostile Work Environment*
**(Plaintiff as Against All Defendants)**

106.     Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

107.     Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment.

108.     Ms. Cardona is a woman and is therefore a protected class member.

109.     Ms. Cardona is Colombian-American and is therefore a protected class member.

110.     Defendants' sexual harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

111.     Defendants' severe and pervasive conduct included, but was not limited to,  making sexually harassing remarks towards Ms. Cardona about her Colombian accent being "sexy", telling Ms. Cardona she "looked sexy in a lab coat," asking Ms. Cardona to go on dates or perform sex acts, telling Ms. Cardona that she "needed a man to fuck her and perform oral sex on her," threatening to kiss Ms. Cardona in the workplace if she did not wear a facemask, calling Ms.

Cardona's husband and all Colombian men "faggots," telling Ms. Cardona that "Cuban men are better than Colombian men," forcing Ms. Cardona to work with her harasser despite being aware of his unlawful behavior and knowing he posed a threat to Ms. Cardona's safety, warning Ms. Cardona not to be alone with her harasser in an area without cameras, and unlawfully terminating Ms. Cardona's employment.

112.    Defendants targeted Ms. Cardona because she was a female. No similarly situated male employees endured the sexually harassing conduct that Ms. Cardona was forced to endure.

113.    The Defendants' sexual harassment was unwelcomed by Ms. Cardona, who had no choice but to endure the discriminatory treatment.

114.    Defendants targeted Ms. Cardona because she was Colombian-American. No similarly situated non-Colombian endured the discriminatory conduct that Ms. Cardona was forced to endure.

115.    The Defendant's discriminatory conduct was unwelcomed by Ms. Cardona, who had no choice but to endure the discriminatory treatment.

116.    The Defendants' sexual harassment and discrimination of Ms. Cardona negatively and significantly impacted Ms. Cardona's life. The Defendants' conduct made Ms. Cardona feel isolated, embarrassed, and ashamed.

117.    As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages,

lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

118. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Cardona's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

119. The conduct of Defendants deprived Ms. Cardona of her statutory rights guaranteed under Title VII.

120. Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT IV**
**42 U.S.C. § 2000e-3**
*Retaliation*
**(Plaintiff as Against All Defendants)**

121. Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

122. Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

123. Ms. Cardona was an individual female and was therefore a protected class member.

124. Ms. Cardona was a Colombian-American and was therefore a protected class member.

125. Ms. Cardona engaged in a protected activity when she repeatedly complained about and reported Osniel's sexual harassment and discriminatory conduct.

126. In response to Ms. Cardona asserting her right to enjoy the same employment benefits as every other employee, the Defendants retaliated against Ms. Cardona.

127.    Defendants retaliated against Ms. Cardona by engaging in conduct, including but not limited to, forcing Ms. Cardona to work with her harasser, witnessing Ms. Cardona being harassed and mocking her as a result, failing to take any meaningful corrective action following Ms. Cardona's reports of harassment and discrimination, and unlawfully terminating Ms. Cardona's employment.

128.    Defendants took the above-mentioned materially adverse actions, among others, against Ms. Cardona because of her protected activities.

129.    Any reasonable employee in Ms. Cardona's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Cardona was forced to endure.

130.    The Defendants' alleged bases for their adverse employment actions against Ms. Cardona are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

131.    As a direct and proximate result of the Defendants' retaliatory conduct in violation of the Title VII, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

132.    The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Cardona's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

133.     The conduct of the Defendants deprived Ms. Cardona of her statutory rights guaranteed under Title VII.

134.     Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT V**
**§ 760.10(1), Fla. Stat.**
*Sex Discrimination*
**(Plaintiff as Against All Defendants)**

135.     Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

136.     The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex. § 760.10(1)(a), Fla. Stat.

137.     Ms. Cardona was an individual female and was therefore a protected class member.

138.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

139.     Defendants subjected Ms. Cardona to discriminatory treatment on the basis of her sex, including but not limited to, making sexually harassing remarks about Ms. Cardona's accent being "sexy", asking Ms. Cardona to go on dates or perform sex acts, telling Ms. Cardona that she needed a man to "fuck" her and "perform oral sex" on her, telling Ms. Cardona that she looked "sexy in a lab coat," threatening to kiss Ms. Cardona in the workplace if she did not wear a facemask,  forcing Ms. Cardona to work with her harasser despite being aware of his unlawful behavior and knowing he posed a threat to Ms. Cardona's safety, warning Ms. Cardona not to be alone with her harasser in an area without cameras, and unlawfully terminating Ms. Cardona's employment.

140.     Defendants targeted Ms. Cardona because she was a woman. No similarly situated male employees endured the discriminatory conduct that Ms. Cardona was forced to endure.

141. The discriminatory actions of the Defendants against Ms. Cardona, as described and set forth above, constitute an adverse employment action for purposes of the FCRA. In subjecting Ms. Cardona to adverse employment actions, the Defendants intentionally discriminated against Ms. Cardona with respect to the compensation, terms, conditions, or privileges of her employment.

142. Even if Defendants could assert legitimate reasons for its adverse actions taken against Ms. Cardona, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Cardona explicitly reserves the right to pursue a mixed-motive theory against Defendant.

143. As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

144. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Cardona's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

145. The conduct of the Defendants deprived Ms. Cardona of her statutory rights guaranteed under the FCRA.

146. Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT VI
### § 760.10(1), Fla. Stat.
### *National Origin Discrimination*
### (Plaintiff as Against All Defendants)

147.     Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

148.     The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's national origin. § 760.10(1)(a), Fla. Stat.

149.     Ms. Cardona was Colombian-American and was therefore a protected class member.

150.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

151.     Defendants subjected Ms. Cardona to discriminatory treatment on the basis of her national origin, including but not limited to, telling Ms. Cardona that her Colombian accent was "sexy" and that Colombian women were "beautiful,"  making frequent derogatory remarks about Colombian men including "all Colombian men are faggots and they don't enjoy going down on women," telling Ms. Cardona that "Cuban men are better than Colombian men…," making Ms. Cardona work with her harasser, and unlawfully terminating Ms. Cardona's employment.

152.     Defendants targeted Ms. Cardona because she was Colombian-American. No similarly situated non-Colombian employee endured the discriminatory conduct that Ms. Cardona was forced to endure.

153.     The discriminatory actions of the Defendants against Ms. Cardona, as described and set forth above, constitute an adverse employment action for purposes of the FCRA.  In subjecting Ms. Cardona to adverse employment actions, the Defendants intentionally

discriminated against Ms. Cardona with respect to the compensation, terms, conditions, or privileges of her employment.

154.    Even if Defendants could assert legitimate reasons for its adverse actions taken against Ms. Cardona, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Cardona explicitly reserves the right to pursue a mixed-motive theory against Defendants.

155.    As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

156.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Cardona's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

157.    The conduct of the Defendants deprived Ms. Cardona of her statutory rights guaranteed under the FCRA.

158.    Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VII**
**§ 760.10(7), Fla. Stat.**
*Hostile Work Environment*
**(Plaintiff as Against All Defendants)**

159.    Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

160.    The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex. § 760.10(1), Fla. Stat.

161.    Ms. Cardona is a woman and is therefore a protected class member.

162.    Ms. Cardona is Colombian-American and is therefore a protected class member.

163.    Defendants' sexual harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

164.    Defendants' severe and pervasive conduct included, but was not limited to,  making sexually harassing remarks towards Ms. Cardona about her Colombian accent being "sexy", telling Ms. Cardona she "looked sexy in a lab coat," asking Ms. Cardona to go on dates or perform sex acts, telling Ms. Cardona that she "needed a man to fuck her and perform oral sex on her," threatening to kiss Ms. Cardona in the workplace if she did not wear a facemask, calling Ms. Cardona's husband and all Colombian men "faggots," telling Ms. Cardona that "Cuban men are better than Colombian men," forcing Ms. Cardona to work with her harasser despite being aware of his unlawful behavior and knowing he posed a threat to Ms. Cardona's safety, warning Ms. Cardona not to be alone with her harasser in an area without cameras, and unlawfully terminating Ms. Cardona's employment.

165.    Defendants targeted Ms. Cardona because she was a female. No similarly situated male employees endured the sexually harassing conduct that Ms. Cardona was forced to endure.

166.    The Defendants' sexual harassment was unwelcomed by Ms. Cardona, who had no choice but to endure the discriminatory treatment.

167.    Defendants targeted Ms. Cardona because she was Colombian-American. No similarly situated non-Colombian endured the discriminatory conduct that Ms. Cardona was forced to endure.

168.    The Defendant's discriminatory conduct was unwelcomed by Ms. Cardona, who had no choice but to endure the discriminatory treatment.

169.    The Defendants' sexual harassment and discrimination of Ms. Cardona negatively and significantly impacted Ms. Cardona's life. Defendants' conduct made Ms. Cardona feel isolated, embarrassed, and ashamed.

170.    As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

171.    The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Cardona's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

172.    The conduct of Defendants deprived Ms. Cardona of her statutory rights guaranteed under the FCRA.

173.    Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT VIII
### § 760.10(7), Fla. Stat.
### *Retaliation*
### (Plaintiff as Against All Defendants)

174.    Ms. Cardona reincorporates the factual allegations in Paragraphs 19 through 79.

175.    The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

176.    Ms. Cardona was an individual female and was therefore a protected class member.

177.    Ms. Cardona was a Colombian-American and was therefore a protected class member.

178.    Ms. Cardona engaged in a protected activity when she complained about and reported Osniel's sexual harassment and discriminatory conduct.

179.    In response to Ms. Cardona asserting her right to enjoy the same employment benefits as every other employee, the Defendants retaliated against Ms. Cardona.

180.    Defendants retaliated against Ms. Cardona by engaging in conduct, including but not limited to, forcing Ms. Cardona to work with her harasser, witnessing Ms. Cardona being harassed and mocking her as a result, failing to take any meaningful corrective action following Ms. Cardona's reports of harassment and discrimination, and unlawfully terminating Ms. Cardona's employment.

181.    Defendants took the above-mentioned materially adverse actions, among others, against Ms. Cardona because of her protected activities.

182.    Any reasonable employee in Ms. Cardona's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Cardona was forced to endure.

183.    Defendants' alleged bases for its adverse employment actions against Ms. Cardona are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

184.    As a direct and proximate result of the Defendants' retaliatory conduct in violation of the FCRA, Ms. Cardona has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Cardona has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Cardona accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

185.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Cardona's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

186.    The conduct of the Defendants deprived Ms. Cardona of her statutory rights guaranteed under the FCRA.

187.    Ms. Cardona further requests that her attorney's fees and costs be awarded as permitted by law**.**

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendants for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory

damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendants' conduct in violation of Title VII, and the FCRA.


Dated:  Miami, Florida            **DEREK SMITH LAW GROUP, PLLC**
        July 25, 2024,             *Counsel for Plaintiff*

                                        */s/ Daniel J. Barroukh*
                                        Daniel J. Barroukh, Esq.
                                        Florida Bar No.: 1049271
                                        Derek Smith Law Group, PLLC
                                        520 Brickell Key Drive, Suite O-301
                                        Miami, FL 33131
                                        Tel: (786) 688-2335
                                        Danielb@dereksmithlaw.com